UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TUCKER DURNFORD,<br><br>          Plaintiff,<br><br>     v.<br><br>MUSCLEPHARM CORP.,<br><br>          Defendant. | Case No. 15-cv-00413-HSG<br><br>**ORDER GRANTING MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>Re: Dkt. No. 39 |

Pending before the Court is Defendant MusclePharm Corp.'s motion to dismiss Plaintiff Tucker Durnford's first amended class action complaint. For the reasons stated below, the motion is GRANTED WITH LEAVE TO AMEND.

**I.     BACKGROUND**

Plaintiff filed his first amended class action complaint ("FAC") on behalf of a nationwide class and a California subclass on July 28, 2015. Dkt. No. 38. The following allegations are taken as true for purposes of this motion to dismiss.

On or about July 13, 2014, Plaintiff purchased Defendant's MusclePharm Arnold Schwarzenegger Series Iron Mass dietary supplement (the "Product") from a GNC store in San Jose, California. Dkt. No. 38 ("FAC") ¶¶ 1, 15. Plaintiff claims that Defendant makes three categories of misrepresentations related to the Product.

First, Plaintiff alleges that Defendant misrepresents the total protein content of the Product ("Protein Content Claim"). In the "Supplement Facts" section of the label, Defendant lists the "Amount Per Serving" of "Protein" as "40 g." *Id.* ¶ 18. Plaintiff alleges that the Protein Content Claim is misleading because Defendant engages in "protein-spiking," "nitrogen-spiking," or "amino-spiking," which is the practice of "[a]dding nitrogen-rich components to raise the level of

measured protein" in a dietary supplement. *Id.* ¶ 7. Because common protein content tests "use nitrogen as a 'tag' for overall protein content," supplement manufacturers can more cheaply increase the measured protein content of their products by using certain nitrogen-rich ingredients, such as free-form amino acids, that are cheaper than actual protein. *Id.* ¶ 6. Plaintiff alleges that "scientific testing of the Product" reveals that "the actual total content per serving of protein is actually around 19.4 grams (as calculated from the total bonded amino acids) as opposed to 40 grams of protein claim[ed] by Defendant for the Product." *Id.* ¶ 23 & Ex. A.

Second, Plaintiff alleges that Defendant misrepresents the composition of the protein content of the Products ("Protein Composition Claims"). On the supplement label, Defendant describes the Product's "Revolutionary 5-Stage Mass Delivery System." *Id.* ¶ 17. Two of those stages are "Muscle Plasma Protein Technology: 40g of a potent blend of hydrolyzed beef protein and lactoferrin protein" and "Performance Growth & Muscle Volumizer: Creatine and BCAA nitrates help promote muscular strength, size and endurance." *Id.* Plaintiff alleges that Defendant's separation of "40g of a potent blend of hydrolyzed beef protein and lactoferrin protein" from "[c]reatine and BCAA nitrates" on the Product label misleadingly suggests that the claimed 40 grams of protein content derives solely from the hydrolyzed beef protein and lactoferrin protein, when in fact it also includes the protein-spiking agents creatine, l-glycine, leucine, iso-leucine, and valine. *Id.* ¶¶ 19-21.

Finally, Plaintiff alleges that Defendant misrepresents to consumers that it does not "nitrogen spike" its Product ("Nitrogen Spiking Claim"). On an unspecified date, a consumer tweeted at Defendant, "I was reading some reviews on your product and some of them talk about nitrogen spiking in your product, could you help me here." *Id.* ¶ 24. In response, Defendant tweeted, "Those are fake then. We don't do anything like that. All products legit and scientifically backed." *Id.*

As a result of Defendant's misrepresentations, Plaintiff was "misled . . . regarding the true nature of the protein content and value [of the Product]." *Id.* ¶ 27. Plaintiff "purchased the Product in reliance on Defendant's labeling and marketing claims," *id.* ¶ 58, and "relied on Defendant's marketing, labeling, and other product literature," *id.* ¶ 75. Plaintiff "would have

2

purchased a different protein product or would have paid less if [he] had not been deceived by Defendant's misleading labeling." *Id.* ¶ 33.

Based on these allegations, Plaintiff brings four causes of action: (1) violation of the California Unfair Competition Law ("UCL"), on behalf of the California subclass; (2) violation of the California Consumers Legal Remedies Act ("CLRA"), on behalf of the California subclass; (3) violation of the California False Advertising Law ("FAL"), on behalf of the California subclass; and (4) breach of express warranty, on behalf of the nationwide class.

## II. DISCUSSION

### A. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A plaintiff must provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. On a motion to dismiss, the court accepts as true a plaintiff's well-pleaded factual allegations and construes all factual inferences in the light most favorable to the plaintiff. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But the plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

Because Plaintiff's claims are premised on allegedly fraudulent conduct, Rule 9(b) also applies. *Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud," including "the who, what, when, where, and how of the misconduct charged." *Id.* at 1124. Claims for fraud must be based on facts "specific enough to give defendants notice of the particular misconduct . . . so that they can defend against the charge." *Id.* Allegations of fraud must meet both Rule 9(b)'s particularity requirement and *Iqbal*'s plausibility standard. *Cafasso v. Gen. Dynamics C4 Sys.,*

United States District Court
Northern District of California

1  *Inc.*, 637 F.3d 1047, 1055 (9th Cir. 2011).

### B. Preemption

Defendant first argues that Plaintiff's claims are preempted by federal law.

#### 1. Legal Standard

"Federal preemption occurs when: (1) Congress enacts a statute that explicitly pre-empts state law; (2) state law actually conflicts with federal law; or (3) federal law occupies a legislative field to such an extent that it is reasonable to conclude that Congress left no room for state regulation in that field." *Chae v. SLM Corp.*, 593 F.3d 936, 941 (9th Cir. 2010) (internal quotation marks omitted).  A court's preemption analysis begins "with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (internal quotation marks omitted).  This approach "is consistent with both federalism concerns and the historic primacy of state regulation of matters of health and safety." *Id.*  Accordingly, "[p]arties seeking to invalidate a state law based on preemption bear the considerable burden of overcoming the starting presumption that Congress does not intend to supplant state law." *Stengel v. Medtronic, Inc.*, 704 F.3d 1224, 1227 (9th Cir. 2013) (internal quotation marks omitted).

#### 2. Statutory and Regulatory Framework

The Federal Food, Drug, and Cosmetic Act ("FDCA") "governs the labeling of food, drugs, cosmetic products and medical devices." *Lilly v. ConAgra Foods, Inc.*, 743 F.3d 662, 664 (9th Cir. 2014).  The Nutrition Labeling and Education Act ("NLEA"), enacted in 1990, amended the FDCA and aimed to "clarify and . . . strengthen the [FDA's] legal authority to require nutrition labeling on foods, and to establish the circumstances under which claims may be made about nutrients in foods." H.R. Rep. No. 101-538 (1990).  Part of the NLEA's purpose was "to create uniform national standards regarding the labeling of food." *Bruton v. Gerber Prods. Co.*, 961 F. Supp. 2d 1062, 1079 (N.D. Cal. 2013) (internal quotation marks omitted).

The FDCA expressly preempts any state or local "requirement respecting any claim . . . made in the label or labeling of food that is not identical to" the requirements imposed by the statute and its accompanying regulations.  21 U.S.C. § 343-1(a)(5).  The meaning of the term

4

"requirement" "reaches beyond positive enactments like statutes and regulations, to embrace common-law duties and judge-made rules." *Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1118 (N.D. Cal. 2010). In this context, "not identical to" means "that the State requirement directly or indirectly imposes obligations or contains provisions concerning the composition or labeling of food [that] . . . [a]re not imposed by or contained in the applicable [federal statute or regulation] . . . or [d]iffer from those specifically imposed by or contained in the applicable [federal statute or regulation]." 21 C.F.R. § 100.1(c)(4). But where a state law requirement "effectively parallels or mirrors" federal requirements, there is no preemption. *Chacanaca*, 752 F. Supp. at 1118.

Of particular relevance here, § 343(r) of the FDCA provides for the preemption of statutes and regulations related to claims "made in the label or labeling of the food which expressly or by implication[] characterize[] the level of any nutrient which is of the type required by paragraph (q)(1) or (q)(2)." 21 U.S.C. § 343(r)(1). Section 343(q)(1)(D) requires that the "label or labeling" of food products intended for human consumption state "the amount of . . . total protein contained in each serving size or other unit of measure." Additionally, federal regulations require that the "declaration of nutrition information on the label" include "the number of grams of protein in a serving, expressed to the nearest gram." 21 C.F.R. § 101.9(c)(7). "Protein content may be calculated on the basis of the factor of 6.25 times the nitrogen content of the food as determined by the appropriate method of analysis as given in the 'Official Methods of Analysis of the AOAC International' . . . ." *Id.* Federal regulations further require that compliance with § 101.9(c)(7) be determined using the testing methodology described in § 101.9(g)(2), which in turn requires that the "sample for nutrient analysis shall consist of a composite of 12 subsamples (consumer units), taken 1 from each of 12 different randomly chosen shipping cases, to be representative of a lot."

### 3. Protein Content Claims

Plaintiff alleges that the Protein Content Claim is misleading because Defendant engages in "nitrogen-spiking," which is the practice of "[a]dding nitrogen-rich components to raise the level of measured protein" in a dietary supplement. FAC ¶ 7. However, FDA regulations expressly provide that protein content may be calculated solely on the basis of nitrogen content.

21 C.F.R. § 101.9(c)(7). And Plaintiff does not allege that Defendant's Protein Content Claim is misleading because it was not calculated in conformity with § 101.9(c)(7). In sum, Plaintiff seeks to hold Defendant liable for calculating protein content using a method prescribed by FDA regulations, in violation of the FDCA's express preemption provision. *See Mee v. I A Nutrition Inc.*, No. 14-cv-05006-MMC, 2015 WL 2251303, at *3 (N.D. Cal. May 13, 2015) (dismissing plaintiff's claim because "it seeks to base liability on defendant's failure to employ a testing procedure not imposed by or contained in any federal regulation" and "is a challenge to the very method allowed by the FDA").

Plaintiff's argument that "nitrogen-based testing is actually prohibited by the FDA for products like Iron Mass that claim to provide a percentage of the recommended daily intake of protein" is misplaced. Dkt. No. 43 ("Opp.") at 3. The regulation cited by Plaintiff in support of this argument reads:

> A statement of the corrected amount of protein per serving, . . . calculated as a percentage of the [Recommended Daily Intake] or [Daily Recommended Value] for protein, as appropriate, and expressed as Percent of Daily Value, may be placed on the label, except that such a statement shall be given if a protein claim is made for the product . . . The "corrected amount of protein (gram) per serving" . . . is equal to the actual amount of protein (gram) per serving multiplied by the amino acid score corrected for protein digestibility.

21 C.F.R. § 101.9(c)(7)(i)-(ii). Contrary to Plaintiff's contention, this regulation does not "prohibit" nitrogen-based testing as the basis for the Protein Content Claim. As an initial matter, the "corrected amount of protein per serving" is calculated by taking the "actual amount of protein," as measured using the nitrogen-based methodology outlined in § 101.9(c)(7), and multiplying it by the "amino acid score corrected for protein digestibility." Moreover, that "corrected amount" is required only in relation to the percentage of the daily recommended value for protein, and nowhere in the complaint does Plaintiff allege that Defendant incorrectly calculated the "% DV" for protein shown on the Product label.[1] This regulation is simply not

---

[1] The FDA industry guidelines cited by Plaintiff underscore that the calculation of the "corrected amount" of protein applies only to the percentage daily value claims made on the supplement label: "When protein is listed as a percent of the 50 gram DRV and expressed as % DV, the % DV is calculated by correcting the actual amount of protein in grams per serving by multiplying the

6

1 applicable to the Protein Content Claim.

2       Additionally, Plaintiff has not alleged that the "scientific testing" he used to determine that the Product only contains 19.4 grams of total protein complied with the testing method mandated by 21 C.F.R. § 101.9(g)(2), which as noted above governs manufacturers' "compliance with the requirements for nutrient content claims," 21 C.F.R. § 101.13(o).  Several district courts have held that "where, as here, an FDA regulation provides that the question of compliance must be determined using the method specified therein, a state law claim that seeks to establish a violation of such regulation by a different methodology is preempted." *Mee*, 2015 WL 2251303, at *4; *see Bruaner v. MusclePharm Corp.*, No. 14-cv-08869-FMO, 2015 WL 4747941, at *9 (C.D. Cal. Aug. 11, 2015) (granting motion to dismiss claims based on defendant's failure to list all ingredients on product label where plaintiff failed to allege that the testing upon which he relied was conducted in accordance with FDA regulations); *Salazar v. Honest Tea, Inc.*, 74 F. Supp. 3d 1304, 1313-14 (E.D. Cal. 2014) (granting motion to dismiss claim based on allegedly misleading antioxidant level claims where plaintiff failed to allege that the independent testing on which she relied had been conducted in accordance with FDA regulations); *Burke v. Weight Watchers Int'l, Inc.*, 983 F. Supp. 2d 478, 480, 483 (D.N.J. 2013) (granting motion to dismiss claim based on alleged calorie content discrepancies where plaintiff failed to allege that her independent laboratory tests were conducted in accordance with the proper methodology); *see also Vital v. One World Co.*, No. 12-cv-00314-JGB, slip op. at 8-9 (C.D. Cal. Nov. 30, 2012) (granting summary judgment for defendant on claims based on allegedly misleading magnesium and sodium content claims where plaintiffs failed to offer evidence showing that the report upon which they relied had been conducted in accordance with FDA regulations).[2]  Because Plaintiff does not allege that

---

amount by its amino acid score corrected for protein digestibility, dividing by 50 grams, and converting to percent." FDA, *Guidance for Industry: A Food Labeling Guide* (Jan. 2013), *available at* http://www.fda.gov/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/LabelingNutrition/ucm064894.htm.

[2] The Court is aware of only one district court that has denied a motion to dismiss on preemption grounds under these circumstances. *See Clay v. Cytosport*, No. 15-cv-00165-MJL, 2015 WL 5007884, at *3 (S.D. Cal. Aug. 19, 2015) ("Of course, in order to ultimately prevail on these claims, Plaintiffs will have to prove that Defendant did not comply with the FDCA provisions listed above.  However, to state a claim, Plaintiffs only need to allege a plausible violation of the FDCA.").  The Court respectfully disagrees with the *Clay* decision and finds that, in order to

7

testing conducted in accordance with the FDA-mandated methodology shows that Defendant's nutrient content claims are false, Plaintiff has not alleged a violation of the FDCA. Accordingly, "plaintiff's state law claims are preempted; if allowed to proceed, the state law claims would impose liability inconsistent with the FDCA." *Salazar*, 74 F. Supp. 3d at 1313; *see also Vital*, slip. op. at 8 ("[B]y mandating that a composite be used to determine compliance, the regulation rejects the requirement that every individual product be labeled in compliance with the Food Labeling Rule. . . . A regulation requiring each individual product or shipping case to be in compliance with the Food Labeling Rule would be much more stringent and impose a greater burden on companies.").

The Court finds that Plaintiff's claims based on the allegedly misleading nature of the Defendant's Protein Content Claim, as currently pled, are preempted.

### 4. Protein Composition Claims

Defendant's Protein Composition Claims address the content of specific types of protein—hydrolyzed beef protein and lactoferrin protein—in the Product. As such, they are outside the scope of § 101.9(c)(7)'s guidelines regarding the calculation of the *total* amount of protein in a product.

*Gubala v. CVS Pharmacy*, No. 14-cv-09039-TMD, 2015 WL 3777627 (N.D. Ill. June 16, 2015), a case cited by Defendant, is distinguishable. In *Gubala*, the plaintiff "allege[d] that he was deceived by the use of the phrases 'Whey Protein Powder' and '26 grams of high-quality protein' on the product's front label into believing the 26 grams of protein were derived solely from whey protein." 2015 WL 37777627, at *4. The *Gubala* court dismissed plaintiff's claims based on those allegations because "[r]emedying the allegedly deceptive labeling would require [the defendant] to specifically identify each source of protein" in the product at issue, and FDA regulations do not so require. *Id.* In this case, however, Defendant's Product Composition Claims

---

plausibly allege a claim here, Plaintiff must allege that scientific testing conducted in accordance with § 101.9(g) demonstrated that Defendant's Protein Content Claim is false or misleading. The Court further notes that Exhibit A to Plaintiff's complaint suggests that only one sample of the Product was tested, as opposed to the 12 samples required to be tested by the FDA regulations. *See* Dkt. No. 6.

8

put the source of protein at issue. Rather than seeking to require Defendant to "specifically identify each source of protein," Plaintiff seeks to require Defendant not to affirmatively state that the Product contains "40g of a potent blend of hydrolyzed beef protein and lactoferrin protein" when the Product does not in fact contain 40g of those particular sources of protein.

Nevertheless, Plaintiff's claims based on the Protein Composition Claims, as currently pled, are preempted. As noted above, Plaintiff has not alleged that the "scientific testing" that forms the basis for Plaintiff's allegation that the Protein Composition Claims are false conformed to the requirements articulated by § 101.9(g)(2).

### 5. Nitrogen Spiking Claim

Unlike his claims based on the Protein Content Claim and the Protein Composition Claims, Plaintiff's claims based on the Nitrogen Spiking Claim do not raise preemption concerns.[3] Plaintiff alleges that Defendant responded to a consumer inquiry regarding Defendant's nitrogen spiking practices by tweeting "Those are fake . . . We don't do anything like that." FAC ¶ 24. Plaintiff's allegations regarding the Nitrogen Spiking Claim do not implicate issues governed by specific FDA regulations. Rather, Plaintiff seeks to hold Defendant liable for allegedly making the affirmative representation that it does not nitrogen spike the Product, when, in actuality, Defendant allegedly does engage in nitrogen spiking. *See id.* ¶¶ 6, 24. To the extent Plaintiff's claims are based on the Nitrogen Spiking Claim, they do not supplant FDA regulations and therefore are not preempted. *See Bruaner*, 2015 WL 4747941, at *7 ("Plaintiff is not attempting to impose a method of calculating protein based on testing of the product that does not conform with FDA's approved test. Nor is he asserting that the amount of protein listed on [the defendant's] label is inaccurate, or that the protein content of the product is less than stated on the product label. Rather, plaintiff alleged that defendant's conduct is fraudulent or misleading because it tells consumers that it does not stuff its protein content, but it actually does.") (internal

---

[3] In its motion, Defendant does not address the Nitrogen Spiking Claim separate and apart from the Protein Content Claim and the Protein Composition Claims. However, Defendant moves to dismiss the FAC in its entirety and generally asserts that "plaintiff's claims are preempted." Mot. at 6. Accordingly, the Court presumes that Defendant seeks to dismiss Plaintiff's claims based on the Nitrogen Spiking Claim as preempted.

quotation marks, citations, and alterations omitted).

\* \* \*

In sum, Plaintiff's claims based on the Protein Content Claim and the Protein Composition Claims are preempted, while his claims based on the Nitrogen Spiking Claim are not.

### C. Standing

To sufficiently plead standing under the FAL, CLRA, or UCL, a plaintiff must allege that he relied on the defendant's purported misrepresentations and suffered economic injury as a result. *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 326 (2011). Common law fraud requires that the victim show reasonable reliance on the allegedly deceptive representation. *In re Tobacco II Cases,* 46 Cal. 4th 298, 312 (2009).

There are no allegations in the FAC regarding what, if any, of Defendant's Product claims were actually relied on by Plaintiff when he purchased the product. Rather, Plaintiff generally alleges that "Plaintiff and the members of the California Subclass purchased the Product in reliance on Defendant's labeling and marketing claims," FAC ¶ 58, and that "Plaintiff and the members of the California Subclass relied on Defendant's marketing, labeling, and other product literature," *id.* ¶ 75. Moreover, neither of those allegations forms the basis for Plaintiff's UCL claim.

It may be reasonable to presume that consumers read and rely on product labels when purchasing a supplement. *See Kwikset*, 51 Cal. 4th at 330; *Delacruz v. Cytosport*, No. 11-cv-03532-CW, 2012 WL 1215243, at \*8 ("[B]ecause Plaintiff had to have the labels in hand to consume the products, the Court construes [the plaintiff's allegations] to imply that she read them."). But it requires an entirely different degree of inference here to presume that Plaintiff read and relied on Defendant's Nitrogen Spiking Claim—which was made on Twitter on an unspecified date—when purchasing the Product. *See id.* at \*9 (dismissing claims based on misrepresentations made on the defendant's website because the plaintiff did "not plead that she read or relied on any statements on the website"). The Court therefore finds that Plaintiff has not adequately alleged reliance with respect to his remaining claims (*i.e.*, those that are based on the Nitrogen Spiking Claim).

Plaintiff's citation to *In re Tobacco II* is not persuasive. In that case, the California Supreme Court stated that where "a plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements." 46 Cal. 4th at 328. The advertising campaign alleged here—assuming the single Twitter exchange alleged can be characterized as a "campaign"—is simply not comparable to the one at issue in *In re Tobacco II*, which lasted for decades. *See Delacruz*, 2012 WL 1215243, at *8 (rejecting citation to *In re Tobacco II* because the plaintiff "failed to allege that Defendant's advertising campaign approached the longevity and pervasiveness of the marketing at issue in *Tobacco II*").[4]

## III.  CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss the FAC is GRANTED. Plaintiff may amend the FAC if he can in good faith sufficiently allege (1) claims that are not preempted, and (2) actual reliance. Any second amended complaint shall be filed within 21 days of the date of this Order.

**IT IS SO ORDERED.**

Dated: December 18, 2015

HAYWOOD S. GILLIAM, JR.
United States District Judge

---

[4] Because the Court dismisses all of Plaintiff's claims on the basis of preemption and failure to plead reliance, the Court does not address Defendant's Rule 9(b) arguments.